UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA



FILED
JAN 2 4 2018
Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

YOLONDA MACK,            )
                         )
    Plaintiff,           )
                         )
v.                       )   Civil Case No. 15-1973 (RJL)
                         )
ASPEN OF D.C., INC., *et al.*, )
                         )
    Defendants.          )

## MEMORANDUM OPINION
(January 24, 2018) [Dkts. ## 24, 26, 28, 31]

Plaintiff Yolonda Mack ("plaintiff" or "Mack") brings this action against Aspen of D.C., Inc. ("Aspen") and Aspen's President and CEO, Brandy R. Butler ("Butler") (collectively, "defendants"). Mack alleges discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as well as failure to pay wages in violation of D.C. Code § 32-1012. *See generally* Compl. [Dkt. # 1]. Currently pending before the Court is defendants' Motion for Summary Judgment. *See* Defs.' Mot. Summ. J. ("Defs.' Mot.") [Dkt. # 26].[1] Having considered the record and relevant case law, the defendants' motion is GRANTED.

## BACKGROUND

When evaluating a motion for summary judgment, the Court accepts the evidence of the non-movant—here, Mack—and resolves all genuine factual disputes in her favor.

---

[1] A few motions arising from discovery and deadline disputes also remain pending. *See* Def. Aspen's Motion to Quash Pl. Counsel's Notice Deps. [Dkt. # 24]; Pl.'s Combined Mot. Rule 56(d) Relief & Sanctions Pursuant to Rule 56(h) ("Pl.'s Rule 56 Mot.") [Dkt. # 28]; Defs.' Mot. to Strike Pl.'s Opp'n to Defs.' Mot. Summ. J. [Dkt. # 31]. I address those motions, as necessary, below.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A non-movant's unsupported allegations, however, are not sufficient to oppose admissible evidence put forward by the party seeking summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). With those principles in mind, I recount the factual background of this dispute.

Aspen is a company that provides temporary staffing to federal, state, and local government agencies as well as to private sector companies. Defs.' Mot. Ex. 1, Aff. of Brandy Butler ("Butler Aff.") ¶ 3 [Dkt. # 26-2]. In 2010, Aspen secured a contract to provide temporary staffing to the District of Columbia Department of General Services ("DGS"). *Id.* ¶ 4. The contract was structured in one-year terms, renewable annually at the sole discretion of DGS. *Id.* ¶¶ 4-5, 7-9. As relevant here, the initial Aspen-DGS contract for Fiscal Year 2010 required Aspen to provide one temporary employee to staff DGS's Eastern Market facility as an assistant manager. *Id.* ¶¶ 5-6. Pursuant to that requirement, Aspen placed Katrina Cuffey ("Cuffey") in the assistant manager position. *Id.* Although her title was assistant manager, Cuffey, curiously, had no supervisory duties with respect to other employees. *Id.* Those supervisory duties instead fell to Barry Margeson, a permanent DGS employee. *Id.* ¶ 14; Defs.' Mot. Ex. 2, Dep. of Yolanda Mack ("Mack Dep.") 22:18-19 [Dkt. # 26-3].

In 2011, DGS revised the scope of work of its contract with Aspen. Butler Aff. ¶ 11. In addition to the assistant manager role, which continued to be occupied by Cuffey, DGS requested that Aspen provide the Eastern Market facility with another temporary employee to serve as an event coordinator. *Id.* In September 2011, Aspen hired Mack to fill that new event coordinator position. *Id.* ¶¶ 11-12. Mack's employment agreement with

Aspen informed Mack that she was an at-will employee of Aspen—not DGS—and that her employment could be terminated at any time. *See* Def.'s Mot. Ex. 11 [Dkt. # 26-12]. As event coordinator, Mack interacted with Cuffey a few days a week regarding bookings at the Eastern Market facility and related issues. *See* Mack Dep. 27:19-28:12.

The events giving rise to this case began a few months after Mack started in her role as event coordinator. At that time, as Mack tells it, Cuffey began to subject Mack to inappropriate sexual comments and advances. Mack recounts an incident in late 2011 or early 2012 when Cuffey invited Mack to attend a "swingers party" and, in the course of that invitation, made crude remarks regarding the potential for Mack and Cuffey to participate in sexual intercourse with other Aspen employees. *See id.* at 35:14-36:7, 47:14-21. In addition, Mack claims that Cuffey sent her a sexually explicit text message in late 2011. *See* Pl.'s Rule 56 Mot. Ex. 6, Decl. of Yolonda Mack ("Mack Decl.") ¶ 9 [Dkt. # 28-6]. Mack states that Cuffey frequently remarked on the size of Mack's breasts and asked if she could touch them. *See* Mack Dep. 35:2-8, 38:12-15. The "final straw," according to Mack, was a late 2013 incident in which Cuffey offered to pay Mack to have sex with Cuffey and an unknown third person. *Id.* at 40:6-11, 52:5. In the month following that incident, Mack says that she informed defendant Butler of Cuffey's inappropriate sexual behavior. *See* Pl.'s Rule 56 Mot. Ex. 3, at 21 [Dkt. # 28-3].[2]

---

[2] Mack also claims that, following Cuffey's invitation to the "swingers party," she told Butler that the invitation made her feel "uncomfortable." Mack Dep. 37:19. But, based on the evidence, the late 2013 conversation was the first time that Mack informed an Aspen representative that she thought she was being sexually harassed.

Around that same time, Mack also confided in an Eastern Market maintenance worker regarding Cuffey's behavior. Mack Dep. 50:1-15. As it turns out, however, Mack's confidant was himself in a relationship with Cuffey and promptly informed Cuffey of Mack's comments. *Id.* at 50:19-51:2. On February 8, 2014, Cuffey confronted Mack outside of Eastern Market, stating that she heard Mack had "a problem" with her. *Id.* at 58:6-12. Although Mack simply walked away from the conversation, the confrontation drove her to file a formal, written complaint with Aspen management in February 2014. *Id.* at 53:1-3, 58:15-20; *see also* Defs.' Mot. Ex. 3 [Dkt. # 26-4]. It is undisputed that Mack experienced no inappropriate sexual comments or behavior following the filing of her formal, written complaint. Mack Dep. 59:4.

Upon Aspen's receipt of the complaint, Aspen immediately began to conduct an investigation into the allegations made by Mack. Pl.'s Rule 56 Mot. Ex. 4, at 5 ("March 2014 Report") [Dkt. # 28-4].[3] As part of the investigation, Aspen management interviewed Cuffey, Mack, and other individuals employed at Eastern Market. *See* March 2014 Report. Notably, during Mack's interview, the Aspen interviewer asked whether Mack wanted Aspen to implement any "remedial measure[s]" to change the work environment. Mack

---

[3] Mack states that she e-mailed a draft version of her formal, written complaint to Butler on the evening of February 18, 2014. Mack Decl. ¶ 4. In that draft version of the complaint, Mack states that she told Butler of Cuffey's inappropriate behavior in November 2013. *See* Pl.'s Rule 56 Mot. Ex. 7, at 34 [Dkt. # 28-7]. According to Mack, she removed that piece of information from her final complaint at the insistence of Aspen Vice President Harrison Boyd, who stated that it could get Butler "in trouble" with DGS. *See* Mack Decl. ¶ 4. Although Boyd's behavior, if true, was inappropriate, it does not change the fact that Aspen promptly began its investigation based on Mack's "original complaint"—i.e., the one she sent to Butler—or the fact that Mack did not experience any sexual harassment from Cuffey following the filing of her complaint. *See* March 2014 Report; Mack Dep. 59:4.

Dep. 97:18. Mack responded by noting that she thought that things "should be good" once Aspen spoke with Cuffey and that Mack was "okay with moving past all of this" in part because she did not "really have to see" Cuffey at Eastern Market. *Id.* at 98:7-14. After the investigation was complete, Aspen issued a report of its findings and recommendations in late March 2014. *See* March 2014 Report. The report noted that Aspen could not "corroborate either the complainant's allegations of sexual harassment, or the respondent['s] denial of such behavior." *Id.* at 2. Yet the report acknowledged that there were communications between Mack and Cuffey that, if substantiated, had the potential to create a "hostile work environment." *Id.* The report also observed that both Mack and Cuffey gave "individual assurances" that they were "willing to continue to work at Eastern Market and believe they can do so effectively." *Id.* To prevent any further misconduct, however, the report required Mack and Cuffey to complete sexual harassment training. *Id.* Aspen's vice president, Boyd, also informed Cuffey "that sexual harassment in the workplace would not be tolerated" and that she "would be terminated" should Boyd learn of any additional complaints. Defs.' Mot. Ex. 4, Aff. of Harrison Boyd ("Boyd Aff.") ¶ 7 [Dkt. # 26-5].

Mack was not satisfied with the conclusions set forth in the report. During an April 2014 meeting where Aspen representatives and Mack met to discuss the report, Mack indicated that she may have additional evidence to substantiate her claims of Cuffey's sexual harassment. Pl.'s Rule 56 Mot. Ex. 3, at 18 [Dkt. # 28-3]. After considering Mack's assertions, Aspen agreed to allow Mack to supplement the internal investigation record with her additional evidence. *Id.* Mack responded by providing Aspen with a sexually

explicit image—an image that Mack claims was sent to her by Cuffey via text message. Mack Decl. ¶ 9. Aspen considered the additional information and issued a finalized report in July 2014. *See* Defs.' Mot. Ex. 5 ("July 2014 Report") [Dkt. # 26-6].

In that July report, Aspen reiterated its findings that Cuffey's communications had the potential to create a hostile work environment. *Id.* It also determined that the sexually explicit image had indeed been sent from Cuffey to Mack, but was transmitted on "personal cell phones after normal work hours." *Id.* at 2. Nonetheless, the report notes that Cuffey had completed her required sexual harassment training, and that Aspen "advised Ms. Cuffey in writing that the behavior alleged by Ms. Mack is unacceptable and against ADC corporate policies and procedures and that any further behavior of this nature and/or acts of retribution would result in further disciplinary actions." *Id.* at 3. The report also stated that an Aspen representative "will continue to monitor the worksite" to ensure "improved working conditions" for Mack. *Id.*

From the time of her formal complaint through the end of the investigation, Mack claims that she experienced various retaliatory actions on the part of Aspen and DGS staff, including increased monitoring by Aspen personnel and questioning about an incident in which cocaine was found in an office at Eastern Market. *See* Mack Dep. 73:20-74:12, 76:5-77:1. Ultimately, Mack's position was phased out as part of a DGS effort to consolidate operations and cut costs. Butler Aff. ¶ 15. In particular, DGS requested that Aspen bid on a new contract that provided only for the retention of the assistant manager position—not Mack's event coordinator position. *Id.*; Defs.' Mot. Ex. 12 [Dkt. # 26-13]. As a result of DGS's alteration of the contract terms, Mack's position at Eastern Market

6

was eliminated effective at the start of Fiscal Year 2014. Mack was informed of that fact in September 2014, and worked through mid-October 2014. Butler Aff. ¶ 16. According to Aspen's Human Resources and Accounting supervisor, Haile Eyob Nessibu, Mack's paycheck was mailed to her last known address after Mack failed to pick up the paycheck at the office. Defs.' Mot. Ex. 13, Aff. of Haile Eyob Nessibu ("Nessibu Aff.") ¶¶ 5, 7 [Dkt. # 26-14]. Mack, for her part, claims that she never received her final paycheck and, more broadly, that the elimination of her position was retaliatory. Mack Decl. ¶ 11.

Based on the above events, Mack filed a Title VII hostile work environment and retaliation complaint with the EEOC in January 2015. Defs.' Mot. Ex. 10 ("Mack EEOC Compl.") [Dkt. # 26-11]. After receiving notice of her right to sue in court, Mack filed this judicial action against Aspen and Butler.[4] In her complaint, Mack alleges discrimination and retaliation in violation of Title VII; she also presses one claim for failure to pay wages in violation of the D.C. Code. *See generally* Compl. Currently before the Court is defendants' Motion for Summary Judgment as well as the parties' dueling motions stemming from discovery and deadline disputes. I now turn to the various issues presented by those motions, ultimately concluding that defendants are entitled to summary judgment.

---

[4] Mack's complaint also names DGS and DGS's Acting Director, Christopher Weaver, as defendants. In a March 2017 Memorandum Opinion, I granted DGS and Weaver's motion to dismiss the claims against them. *See generally* 3/30/17 Mem. Op. [Dkt. # 22]. I did so after concluding that Mack had failed to allege facts that, taken as true, would state a claim that DGS was her employer for purposes of Title VII or establish a causal link between her complaint to Aspen and the phasing out of her position by DGS in October 2014. *See id.* at 5-9 & n.1.

## STANDARD OF REVIEW

The defendants have moved for summary judgment. Summary judgment may be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "may affect the outcome of the litigation." *Montgomery v. Risen*, 875 F.3d 709, 713 (D.C. Cir. 2017). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

As previously noted, a court examining a summary judgment motion must accept the nonmoving party's statements as true and view all evidence and inferences in the nonmoving party's favor. *See id.* at 255. The party moving for summary judgment bears the initial burden of identifying evidence that demonstrates that there is no genuine issue of material fact. *See Celotex Corp.*, 477 U.S. at 323. It can satisfy that burden by "citing to particular parts of materials in the record," or by "showing that the materials cited do not establish" the "presence of a genuine dispute." Fed. R. Civ. P. 56(c). If the moving party meets its burden, it then falls to the nonmoving party—here, plaintiff—to identify the "specific facts" and "properly support" any allegations showing there is a genuine issue for trial. *Id.* at 324 (internal quotation marks omitted); *Anderson*, 477 U.S. at 256. If the nonmoving party fails to proffer relevant evidence, the moving party may succeed on summary judgment by citing that "failure of proof." *Celotex Corp.*, 477 U.S. at 323.

## ANALYSIS

In her complaint, Mack claims that defendants violated Title VII by subjecting her to a hostile work environment and retaliating against her for complaining about that

environment. Mack also alleges that defendants violated the D.C. Code by illegally withholding her final paycheck. Defendants have moved for summary judgment on all of Mack's claims. I will address Mack's Title VII and D.C. Code claims in turn.

**A. Mack's Title VII Claims**

Title VII of the Civil Rights Act of 1964, as relevant here, makes it unlawful for an employer to discriminate against any individual with respect to "compensation, terms, conditions, or privileges of employment" because of that individual's "sex." 42 U.S.C. § 2000e-2(a)(1). In addition to outlawing "status-based discrimination," *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2522 (2013), Title VII also precludes employers from retaliating against an employee "on account of an employee's having opposed, complained of, or sought remedies for, unlawful workplace discrimination," *id.* (citing 42 U.S.C. § 2000e-3(a)). Mack asserts that defendants engaged in both sex discrimination and retaliation in violation of Title VII. I will follow the lead of the parties and analyze Mack's discrimination and retaliation claims separately.

1. <u>Sex Discrimination Claim</u>

In this case, Mack grounds her discrimination claim in Cuffey's inappropriate sexual comments and behavior, which Mack contends created an unlawful hostile work environment. To prove an actionable "hostile work environment" sex discrimination claim under Title VII, a plaintiff must show that his or her workplace is "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Vickers v. Powell*, 493 F.3d 186, 197 (D.C. Cir. 2007) (internal quotation

9

marks omitted) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). Mack contends that the various comments and overtures from Cuffey, made over the course of two years, were sufficiently severe or pervasive to create a hostile work environment. Defendants counter that Mack's hostile work environment claim was not timely exhausted, and, in any event, fails on the merits. Unfortunately for Mack, defendants are correct.

The first problem with Mack's discrimination claim is that it was not timely exhausted with the Equal Employment Opportunity Commission ("EEOC"). As with all Title VII plaintiffs, an employee seeking to press a hostile work environment claim must "exhaust" her remedies by filing a timely employment discrimination charge with the EEOC. *See* 42 U.S.C. § 2000e-5(e); *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109-10 (2002). Typically, the time for filing with the EEOC is 180 days. But in jurisdictions, such as the District of Columbia, where a "worksharing agreement" exists between the EEOC and a local fair employment practices office—here, the D.C. Office of Human Rights—that time period may be increased to 300 days. Although there is some dispute in the case law regarding when the 300-day as opposed to the 180-day window applies, *see, e.g., Ashraf-Hassan v. Embassy of France*, 878 F. Supp. 2d 164, 170-71 (D.D.C. 2012) (recounting conflicting D.C. Circuit opinions on the subject), I need not tackle that issue here. Even accepting that the lengthier 300-day time period is applicable to Mack's claims, she fails to satisfy it.

Because hostile work environment claims are "composed of a series of separate acts that collectively constitute one 'unlawful employment practice,'" the applicable rules for timeliness are different than those for Title VII claims based upon discrete employment

10

actions. *Wise v. Ferriero*, 999 F. Supp. 2d 286, 294 (D.D.C. 2013) (quoting *Morgan*, 536 U.S. at 117). For a plaintiff's hostile work environment claim to be deemed timely filed with the EEOC, a plaintiff must show that "an act contributing to the claim occurs within the filing period," even if other "component acts of the hostile work environment fall outside the statutory time period." *Morgan*, 536 U.S. at 117. However, and critically for purposes of this case, that *Morgan* rule is not an "open sesame to recovery for time-barred violations." *Baird v. Gotbaum*, 662 F.3d 1246, 1251 (D.C. Cir. 2011). Rather, timely incidents and time-barred incidents must still be "part of the same actionable hostile environment claim." *Id.* (internal quotation marks omitted). Actions qualify as part of the same hostile environment claim, according to our Circuit, "only if they are adequately linked into a coherent hostile environment claim—if, for example, they 'involve the same type of employment actions, occur relatively frequently, and are perpetrated by the same managers.'" *Id.* (alterations omitted) (quoting *Morgan*, 536 U.S. at 120-21). On the other hand, if "certain intervening action by the employer" mitigated the original harassment, then the time-barred acts cannot be revived for purposes of Title VII's exhaustion rule. *Id.* (quoting *Morgan*, 536 U.S. at 118).

Applying those principles, it is clear that Mack's discrimination claim is untimely. Mack filed her EEOC complaint on January 15, 2015. For that complaint to be timely under the 300-day limit, a component act of Mack's hostile environment claim must have occurred after March 21, 2014. Mack concedes that Cuffey's last sexual comment occurred in November 2013, over four months prior to that date, and that her final confrontation with Cuffey occurred on February 8, 2014, over one month prior to that date. Mack

11

nonetheless argues that other actions by Aspen, including its investigation, the issuance of the March Report, and the issuance of the revised July Report, serve to revive her otherwise time-barred clams. I disagree. Mack's own testimony—in which she acknowledges that no sexual comments were made after the filing of her formal complaint—shows that Cuffey's harassment ceased long before the 300-day filing window commenced. Mack Dep. 59:4; *cf. Morgan*, 536 U.S. at 120-21; *Baird*, 662 F.3d at 1251. Although Mack questions Aspen's investigation, she has not alleged that it involved the "same type of employment actions"—i.e., inappropriate sexual remarks—or was "perpetrated by the same" individuals—i.e., Cuffey—as the time-barred incidents. *Morgan*, 536 at 120-21.[5] For those reasons, Mack may not rely upon the investigations or reports to revive her otherwise time-barred hostile work environment claim.

Even putting the issue of timeliness aside, Mack's discrimination claim fails on the merits. It is well-established that an "employer's liability for a hostile work environment sexual harassment claim differs depending on who does the harassing." *Curry v. District of Columbia*, 195 F.3d 654, 659 (D.C. Cir. 1999); *see Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2441-43 (2013). Here, Mack concedes that Cuffey, her co-worker with no supervisory duties, was the only Aspen employee to subject Mack to sexually inappropriate comments.[6] In such a situation, "the employer is liable only if it was negligent in controlling working conditions." *Vance*, 133 S. Ct. at 2439. To clear the "higher hurdle

---

[5] Indeed, as discussed below, Mack has failed to show that defendants' actions violated their duties under Title VII or otherwise contributed to the allegedly hostile work environment. *See infra* pp. 12-14.

[6] There is doubt whether Cuffey's intermittent comments, made over the course of two years, are sufficiently severe and pervasive to create a hostile work environment. I need not resolve that question, however, given that Mack fails to show timely exhaustion or that Aspen was negligent.

under the negligence standard," a plaintiff bears the burden of establishing that the employer "knew or should have known of the harassment and failed to implement prompt and appropriate corrective action." *Curry*, 195 F.3d at 660. Mack has not met that burden.

Cuffey's inappropriate behavior towards Mack began in late 2011. But the evidence shows that Mack did not make Aspen or Butler aware of the alleged harassment until November 2013 at the earliest.[7] Mack claims that Butler did not take sufficient action to stop the sexual harassment, but at the same time, Mack has not identified any sexual comments made by Cuffey after November 2013. To be sure, Cuffey subsequently confronted Mack about Mack's complaints to an Eastern Market maintenance worker (not to Butler), and it was that confrontation that drove Mack to file her first formal, written complaint with Aspen. But just a few days after the filing of that complaint, Aspen initiated an investigation into Mack's allegations. *See* July 2014 Report 1. Pursuant to the investigation, Aspen managers interviewed Cuffey, Mack, and other individuals employed at Eastern Market. *Id.* Aspen also asked Mack whether she wanted Aspen to implement any changes to the work environment. *See* Mack Dep. 97:1-2. Mack *declined*, noting that she thought things "should be good" once Aspen spoke with Cuffey and that she was "okay with moving past all of this" given that she did not "really have to see" Cuffey at Eastern Market. *Id.* at 97:7-14.

---

[7] Although Mack told Butler in casual conversation that Cuffey's invitation to the "swingers party" made Mack "uncomfortable," Mack Dep. 37:19, Mack's own testimony and documents indicate that she did not inform Butler or any other Aspen employee of the fact that she thought she was being sexually harassed by Cuffey until November 2013. *See, e.g.*, Pl.'s Rule 56 Mot. Ex. 7, at 32-33.

13

Aspen's investigation culminated in a March 2014 report in which Aspen concluded that it could *not* substantiate Mack's allegations, but would nonetheless require Cuffey and Mack to undergo sexual harassment training based on the potential that the environment had been hostile. March 2014 Report 2. Boyd, Aspen's vice president, also informed Cuffey that she would be terminated if she engaged in any further misbehavior. Boyd Aff. ¶ 7. When Mack was not satisfied with that outcome, Aspen gave her an opportunity to supplement the investigatory record. Pl.'s Rule 56 Mot. Ex. 3, at 18. It then issued a revised report that maintained the training requirement and warned Cuffey that any additional inappropriate actions would be grounds for further discipline. July 2014 Report 4. In short, the evidence shows both that Cuffey's sexual harassment ceased at the point when Aspen or Butler "knew or should have known of the harassment" and that Aspen promptly initiated an investigation and reprimanded Cuffey after Mack's first formal complaint. *Curry*, 195 F.3d at 660. Mack has therefore failed to clear the "high[] hurdle under the negligence standard" that applies to her hostile work environment claim. *Id.*

2. Retaliation Claim

Mack claims that Aspen and Butler also violated Title VII by retaliating against her for filing a harassment complaint. For Mack to succeed on that claim, which defendants concede was timely filed with the EEOC, she must show that defendants subjected her to a "materially adverse" employment action because of her opposition to an unlawful employment practice. *Nassar*, 133 S. Ct. at 2522; *Durant v. D.C. Gov't*, 875 F.3d 685, 697 (D.C. Cir. 2017). As relevant here, that requires proof: 1) that, following her complaint, Mack was subjected to an employment action sufficiently serious to "dissuade a reasonable

worker from making or supporting a charge of discrimination," *Durant*, 875 F.3d at 698 (internal quotation marks and alteration omitted) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)); and 2) that the adverse action would not have occurred in the absence of the alleged retaliation—in other words, that "her protected activity was a but-for cause of the alleged adverse action by the employer," *Nassar*, 133 S. Ct. at 2534. If Mack satisfies that burden, then it falls to the employer to provide a legitimate, nonretaliatory reason for its action. *Durant*, 875 F.3d at 697.

According to Mack, Aspen representatives retaliated against her by questioning her regarding a bag of cocaine found in the Eastern Market office space; subjecting her to heightened scrutiny by having a project manager more thoroughly supervise her work; and ultimately phasing out her position at Eastern Market.[8] Mack's first two arguments can be disposed of quickly. Based on the record, neither Mack's brief questioning (to which Cuffey was also subjected) nor her increased supervision rises to the level of a materially adverse employment action. *Cf. Clark v. Johnson*, 206 F. Supp. 3d 645, 660-61 (D.D.C. 2016) (employee failed to demonstrate that employer's interviews constituted materially adverse employment actions); *Durant*, 875 F.3d at 697-98 (letter of admonishment

---

[8] Mack also claims that DGS promised to create a full-time position for her, but reneged following Mack's harassment complaint. To start, it is worth noting that after filing her internal complaint, Mack *was* offered the chance to take on additional work with DGS. Although she recognized the DGS offer as a "dynamic opportunity," she declined it, citing the demands of her "current workload." Defs.' Mot. Ex. 7 [Dkt. # 26-8]. In any event, with respect to Mack's claim regarding the denial of a position with DGS, this Court already dismissed DGS from the case on the basis that Mack failed to allege facts sufficient to show a nexus between her sexual harassment complaints and any subsequent action by DGS. *See* 3/30/17 Mem. Op. at 5-9 & n.1. Moreover, Mack has not demonstrated that DGS created the position Mack identifies— a fact that precludes a finding of retaliation. *See Taylor v. Solis*, 571 F.3d 1313, 1321 (D.C. Cir. 2009). Mack's retaliation claim based on the "withholding" of her paycheck also fails: The undisputed evidence shows that Mack did not pick up her paycheck when instructed and that the paycheck was subsequently mailed to Mack's last known home address. *See* Nessibu Aff. ¶¶ 5, 7; Defs.' Mot. Ex. 13, at 6.

informing employee of "specific deficiencies regarding his conduct" not materially adverse action); *Taylor v. Solis*, 571 F.3d 1313, 1321 (D.C. Cir. 2009) (requirement that employee submit "biweekly reports on the status of her work" not materially adverse action).

The termination of Mack's event coordinator position, by contrast, may qualify as a materially adverse employment action. But the evidence with respect to Mack's termination shows that it was DGS's decision—not defendants' decision—to phase out the event coordinator position in order to cut costs. *See* Butler Aff. ¶ 15. Under DGS's new request for services and contract with Aspen that began in Fiscal Year 2014, Aspen was only obligated to provide Eastern Market with the "assistant manager position" occupied by Cuffey. *Id.*; Defs.' Mot. Ex. 12. As a result of that "legitimate, nonretaliatory reason"—namely, DGS's decision to cut costs and restructure its staffing needs at Eastern Market—Aspen informed Mack that her position at Eastern Market would not be maintained. *Durant*, 875 F.3d at 697. Mack has failed to meet her burden to come forward with evidence to show that Aspen's explanations and its decision to reduce staff in order to comply with the new DGS contract were mere pretext for its unlawful discrimination. *Cf. Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008).[9] Her retaliation claim against the defendants therefore fails as a matter of law.[10]

---

[9] In her reply, Mack argues that Aspen may be held liable for retaliation on the basis that it failed to take corrective action to remedy retaliatory acts on the part of *DGS*. But at the motion to dismiss stage, this Court *dismissed* the DGS defendants from the case, determining, as relevant here, that Mack failed to plead facts sufficient to establish a nexus between her protected Title VII activity and DGS's decision to reduce its staffing levels. Mack has not challenged or otherwise asked for reconsideration of that decision, and her belated efforts to premise Aspen's liability on the acts of the DGS defendants are unavailing.

[10] After failing to abide by the requisite deadline to oppose defendants' motion for summary judgment (a deadline that had been extended by the Court at her request), Mack filed a belated opposition

## B. Mack's D.C. Code Claim

In addition to her Title VII claims, Mack asserts that defendants violated a provision of the D.C. Wage and Hour Law, as modified by the D.C. Minimum Wage Revision Act, when it withheld her final paycheck. *See* Compl. ¶¶ 31-34 (citing D.C. Code § 32-1012). Mack is wrong. Even putting aside the fact that Aspen asked Mack to come pick up her paycheck and then sent a paycheck to Mack's last known address, the D.C. Code provisions Mack cites dictate the minimum wages an employer must pay, not the process or timing of wage payments. *See, e.g., Fudali v. Pivotal Corp.*, 310 F. Supp. 2d 22, 24-26 (D.D.C. 2004) (D.C. Wage and Hour Law as codified in § 32-1001 *et seq.* "quite clearly confines itself to minimum wage issues"). Accordingly, Mack's claim under D.C. Code § 32-1012 fails.

---

as well as a motion for Rule 56(d) relief and Rule 56(h) sanctions. *See* Pl.'s Rule 56 Mot. [Dkt. # 28]. The Court will DENY Mack's Rule 56 motion.

First, citing Rule 56(d), Mack asks this Court to defer ruling on defendants' motion for summary judgment until she has had the opportunity to complete additional depositions. Specifically, Mack says she needs to depose Butler, Boyd, and Nessibu in order to "confirm the facts established" by documents in Mack's possession and "clarify the information contained in their affidavits." Mem. P & A Supp. Pl.'s Rule 56 Mot. 25. To start, Mack did not comply with Local Civil Rule 7(m)'s meet and confer requirement—a failure that warrants denial of her motion. Beyond that, as defendants rightly point out, Rule 56(d) is not a means by which a party can delay the inevitable by making conclusory allegations regarding the need for additional discovery at the eleventh hour. *See* Defs.' Opp'n Pl.'s Rule 56 Mot. 6-7 (collecting cases). Here, Mack has failed to satisfy her obligation to point out the "particular facts" she seeks to discover and why those facts would be material to the outcome of the litigation. *Smith v. United States*, 843 F.3d 509, 513 (D.C. Cir. 2016) (quoting *Convertino v. U.S. Dep't Justice*, 684 F.3d 93, 99-100 (D.C. Cir. 2012)). Even more importantly, I have taken all of Mack's factual assertions—including those that contradict the facts as told by defendants—as true for purposes of this motion, and have concluded that her claims nonetheless fail as a matter of law. Given that fact, Mack's attempts to use Rule 56(d) discovery to undermine the credibility of Aspen's witnesses are futile. *See* Defs.' Opp'n Pl.'s Rule 56 Mot. 10-13.

Second, Mack moves for sanctions pursuant to Rule 56(h), arguing that Aspen's declarations were submitted "in bad faith." Fed. R. Civ. P. 56(h). But Mack has not supported that claim by, for example, showing that the declarations "directly contradicted previous sworn testimony" or were submitted "for the sole purpose of delaying the beginning of the trial." 10B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2742 (4th ed. 2013). The mere fact that Mack disputes the assertions contained in Aspen's declarations does not make this situation analogous to those "few situations in which the courts have resorted to Rule 56(h)." *Id.*

## CONCLUSION

For the foregoing reasons, the Court GRANTS defendants' Motion for Summary Judgment. An Order consistent with this decision accompanies this Memorandum Opinion.[11]

RICHARD J. LEON
United States District Judge

---

[11] Because I am granting defendants' Motion for Summary Judgment even having considered plaintiff's opposition and the supporting materials, I will DENY AS MOOT defendants Motion to Strike Plaintiff's Opposition [Dkt. # 31], notwithstanding the fact that Mack's opposition was filed late, without motion, in violation of Federal Rule of Civil Procedure 6(b). I will similarly DENY AS MOOT Aspen's Motion to Quash Plaintiff Counsel's Notice of Depositions [Dkt. # 24].